09-UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TACO ESPECIAL and
PROSPERO GALEANA,

    Plaintiffs,

-vs-

JANET NAPOLITANO, Secretary of Homeland
Security; and
ALEJANDRO MAYORKAS, Director, U.S.
Citizenship and Immigration Services,

    Defendants.
_____/

Case No. 09-10625
Hon: AVERN COHN

**MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE**

**I. INTRODUCTION**

This is an Administrative Procedures Act (APA) case arising out of the United States Citizenship and Immigration Services's (USCIS) denial of an Immigrant Petition for Alien Worker. Plaintiff Taco Especial is a Mexican restaurant located in Ecorse, Michigan. It is registered as a C-corporation. Taco Especial filed a Form I-140, Immigrant Petition for Alien Worker, on behalf of Prospero Galeana (Galeana), an illegal immigrant who it sought to employ as a chef. The petition was denied by the USCIS. Defendant Janet Napolitano is the Secretary of the Department of Homeland Security, the agency in which the USCIS

is housed. Alejandro Mayorkas is the director of the USCIS.[1] Taco Especial has appealed the USCIS decision on grounds that it was arbitrary and capricious in violation of the APA.

Now before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the government's motion for summary judgment will be granted and Taco Especial's motion for summary judgment will be denied.

## II. FACTS

The following facts are taken from the Administrative Record.

Galeana is a Mexican citizen who entered the United States illegally in 1989. Prior to entering the United States, Galeana worked at La Cabana del Pescador,[2] a restaurant in Mexico. His former employer stated that he "worked in the kitchen area providing support in activities related to this department as a cook." Galeana began working at Taco Especial in 1992.[3]

On April 16, 2001 Taco Especial filed a Form ETA-750 – Application for Permanent Employment Certification – with the United States Department of Labor (DOL) for the position of Chef. This position required 3.8 years of experience as a chef. The proffered wage was $25.00 per hour or $52,000 per year (based on a 40-hour work week). After

---

[1]Because Napolitano and Mayorkas have been sued in their official capacities, the Court will refer to the defendants collectively as "the government." Mayorkas has been substituted for Michael Aytes pursuant to FED. R. CIV. P. 25(d)

[2]La Cabana del Pescador has since changed its name to La Cabana de Yeyo S.A. de C.V.

[3]There is some ambiguity as to the beginning of the business relationship between Galeana and Taco Especial. Taco Especial has produced a W2 for Galeana for 1992. However, Taco Especial was not incorporated until 1999. In any event, Galeana was employed by Taco Especial before it began any process with USCIS.

finding that there were no qualified, able, and willing US workers to fill the position and that employing an alien would not have an adverse impact on American workers, the DOL granted Taco Especial's application on May 25, 2005.

On July 18, 2006 Taco Especial filed a Form I-140 – Immigrant Petition for Alien Worker – with the USCIS on behalf of Galeana.

On August 23, 2006 the USCIS sent a request for evidence (RFE) to Taco Especial asking for the restaurant's annual reports, prepared federal income tax returns, and/or audited financial statements for the years 2001-05. It also asked for W2s evidencing wages earned by Galeana while working for Taco Especial. Taco Especial responded by providing federal income tax returns with the following information:[4]

| Year | Gross Income ($) | Net Income ($) | Net Current Assets ($) | Salaries Paid ($) | Officer's Salary ($) |
|---|---|---|---|---|---|
| 2001 | 240,677 | -12,727 | 7,416 | 95,835 | 67,750 |
| 2002 | 226,977 | -5,627 | 7,780 | 81,985 | 57,200 |
| 2003 | 206,010 | 5,118 | 10,006 | 82,515 | 37,075 |
| 2004 | 194,646 | -6,529 | 6,485 | 69,732 | 42,400 |
| 2005 | 198,613 | -3,595 | 6,723 | 85,145 | 28,500 |
| 2007 | 191,673 | -3,819 | N/A | 81,320 | 26,200 |

Taco Especial also included Galeana's W2 forms for the following years: 1992 ($5,9982.27), 1997 ($13,412.03), 2000 ($18,173.28), and 2001 ($17,450.00).

On January 30, 2007 USCIS denied Taco Especial's Form I-140 petition on grounds

---

[4]The 2007 Federal Income Tax Returns were submitted on June 2009 after Taco Especial's petition was reopened by the AAO.

that Taco Especial failed to show an ability to pay the proffered wage of $25.00 per hour. Specifically, the USCIS found that (1) Taco Especial did not currently pay Galeana the proffered wage, (2) the proffered wage exceeded Taco Especial's net income for each year in question, and (3) the proffered wage exceeded the difference between Taco Especial's current assets and liabilities for each of the years in question.

On February 27, 2007 Taco Especial appealed the USCIS decision to the Administrative Appeals Office (AAO). It asserted that it could demonstrate the ability to pay the proffered wage if the correct accounting principles were used. Taco Especial included a report from an accountant to who stated that (1) depreciation should be added back into Taco Especial's net income, (2) because Taco Especial was a C-corporation and was subject to double taxation, it was unlikely to ever show a profit, and (3) in his opinion, Taco Especial was a viable business. The AAO affirmed the USCIS decision, finding that Taco Especial had not proved an ability to pay the proffered wage.

On January 22, 2009 Taco Especial and Galeana (collectively plaintiffs) filed this action claiming that the denial of the Form I-140 petition violated the APA. The plaintiffs alleged that the government erroneously applied the regulation requiring proof of ability to pay the proffered wage.

On April 27, 2009 the AAO reopened Taco Especial's Form I-140 petition on its own motion. Taco Especial was given 30 days to submit additional evidence concerning its ability to pay the proffered wage and of the applicability of <u>Matter of Sonegawa</u>, 12 I&N Dec. 612 (BIA 1967) to its petition. Taco Especial submitted its 2007 Federal Income Tax Return in support of its ability to pay the proffered wage. In support of its argument regarding the applicability of <u>Sonegawa</u>, Taco Especial submitted a 2009 employment

4

summary for the metro Detroit area, evidence of the prevailing wage for "cooks" in metro Detroit, and news articles purporting to show that Galeana was well-known as a Mexican chef and that his services were integral to Taco Especial's continued viability.

On July 10, 2009 the AAO again denied Taco Especial's petition. It gave the following reasons for the denial: (1) Taco Especial failed to show its ability to pay the proffered wage, (2) Taco Especial could not show an ability to pay the proffered wage based on its Federal Income Tax Returns, (3) based on River Street Donuts, LLC v. Napolitano, 558 F.3d 111 (1st Cir. 2009), the USCIS did not err in refusing to take depreciation into account in calculating net income, (4) that Sonegawa was not applicable in this case, and (5) Taco Especial could not alter the Form I-140 by changing the position from "chef" to "cook."

### III. STANDARD OF REVIEW

The motions before the Court are styled as motions for summary judgment. The Court notes the concerns expressed by the Sixth Circuit in Alexander v. Merit Systems Protection Board, 165 F.3d 474, 480-81 (6th Cir. 1999). In that case, it "suggested that the use of summary judgment is inappropriate for judicial review of an administrative action under the Administrative Procedure Act." Donaldson v. United States, 109 Fed. App'x 37, 39-40 (6th Cir. 2004). The primary concern is that review of agency decisions via motions for summary judgment "invites improper consideration of evidence outside the administrative record and reliance upon post hoc rationalizations for the agency's action." Alexander, 165 F.3d at 480. The Court believes that a motion to affirm would be more appropriate. However, a district court may enter judgment in response to a motion for summary judgment so long as the proper standard of review is used. See id. at 480-81.

5

Under the APA, a court must set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the APA is deferential and a court must not "substitute its judgment for that of the agency." Motor Vehicle Manufacturer's Association v. State Farm Mutual Auto Insurance Co., 463 U.S. 29, 43 (1983).

Judicial review is limited to the administrative record that was before the agency at the time of its decision. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-20 (1971). Based on the record before it, an agency is required to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Manufacturer's Association, 463 U.S. at 43 (internal quotation omitted). Therefore, a party challenging an agency action is required to "show that the action had no rational basis or that it involved a clear and prejudicial violation of the applicable statutes or regulations." McDonald Welding v. Webb, 829 F.2d 593, 595 (6th Cir. 1987). Moreover, a court must give an agency's interpretation of its own regulations "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994) (internal quotations omitted).

## IV. ANALYSIS

### A. The Law

**1.**

The Immigration and Nationality Act (INA) governs the issuance of visas to immigrant aliens seeking admission to the United States after receiving permanent job

6

offers as skilled or professional workers. 8 U.S.C. § 1153(b)(3)(A). Authority to administer this statute has been delegated to the Secretary of Homeland Security and sub-delegated to the USCIS. 8 U.S.C. § 1103(a)(1); 8 C.F.R. § 2.1.

Before obtaining a visa for permanent employment, an alien's prospective employer must obtain a certification from the DOL stating that there are no qualified, able, and willing U.S. workers who can fill the position. 8 U.S.C. 1182(a)(5)(A)(i)(I). This certification is obtained by filing and obtaining approval for a Form ETA-750. 20 C.F.R. § 565.21(a) (2004).[5]

**2.**

Once an employer obtains approval of a Form ETA-750, it can petition the USCIS to classify a specific alien beneficiary as an employment-based immigrant using a Form I-140. See 8 C.F.R. § 204.5©. An employer bears the burden of showing that the job offer to the beneficiary is a realistic one. Thus the employer must show that the prospective employee meets the minimum job requirements specified in the Form ETA-750, 8 C.F.R. § 205.(1)(3)(ii), and that the employer has the ability to pay the wage specified in the Form ETA-750, 8 C.F.R. § 204(g)(2).[6]

---

[5] In 2005, the DOL instituted a new labor certification program using Form ETA-9089. See 69 Fed. Reg. 77326, 77392 (Dec. 27, 2004) (codified at 20 C.F.R. § 656.17(a)). Because Taco Especial labor certification application was filed in 2001, it utilized Form ETA-750. Therefore, the Court will refer to this outdated form in this memorandum and order.

[6] 8 C.F.R. § 204.5(g)(2) states:
> Any petition filed by or for an employment-based immigrant which requires an offer of employment must be accompanied by evidence that the prospective United States employer has the ability to pay the proffered wage. The petitioner must demonstrate this ability at the time the priority date is

7

**a.**

An employer must demonstrate the ability to pay the proffered wage beginning at the time the ETA-750 was approved and continuing until the petition to hire an alien is approved. 8 C.F.R. § 204.5(g)(2). USCIS has established three primary methods by which an employer can conclusively establish the ability to pay the proffered wage. First, an employer can show that he is already employing the alien beneficiary at a wage equal to that specified in the Form ETA-750. USCIS Memorandum, <u>Determination of Ability to Pay under 8 CFR 204.5(g)(2)</u>, (May 4, 2004). Second, an employer can show that its yearly net income exceeds the expected yearly wage specified in the Form ETA-750. <u>Id.</u> Finally, an employer can show that its net current assets[7] exceed the expected yearly wage specified in the Form ETA-750. <u>Id.</u> Even if an employer fails to meet any of the three criteria, the USCIS has the discretion to consider any other evidence provided by the petitioner and may use it to find that an employer has the ability to pay the proffered wage.

**b.**

---

established and continuing until the beneficiary obtains lawful permanent residence. Evidence of this ability shall be either in the form of copies of annual reports, federal tax returns, or audited financial statements. In a case where the prospective United States employer employs 100 or more workers, the director may accept a statement from a financial officer of the organization which establishes the prospective employer's ability to pay the proffered wage. In appropriate cases, additional evidence, such as profit/loss statements, bank account records, or personnel records, may be submitted by the petitioner or requested by the Service.

[7]Net current assets are defined as the difference between current assets and current liabilities.

Even if an employer cannot establish the ability to pay the proffered wage at all times since approval of the ETA-750, it can still gain approval of its Form I-140 petition by establishing a reasonable expectation of future profits sufficient to pay the proffered wage based on a totality of the circumstances. See In re matter of Sonegawa, 12 I&N Dec. 612 (BIA 1967). In Sonegawa an employer's petition to hire an alien worker was denied because its net income in 1966 ($280) was less than the proffered wage of $6,240 per year.

The denial was reversed by the Board of Immigration Appeals (BIA) after a fact-specific analysis of the employer's financial condition. The BIA first noted that the small profit in 1966 was due to unique conditions that were not likely to be repeated. In 1966 the employer changed locations and was required to pay double rent for five months and was unable to conduct any business for a period of time while the actual move took place. Sonegawa, 12 I&N at 614. In the following year, the employer's business rebounded and showed a net profit of $4,774 for the first five months of 1967. Id. The BIA also noted that the employer enjoyed a national reputation as a dress-maker as evidenced by articles published in popular fashion magazines. Id. at 615. Based on this evidence, the BIA found that the employer's "expectations of continued increase in business and increasing profits are reasonable expectations and that it has been established that she has the ability to pay the beneficiary the stipulated wages." Id. Under the reasoning of Sonegawa, an employer who has experienced and recovered from an isolated period of economic duress can rely on its renewed profitability in demonstrating its ability to pay a proffered wage.

**3.**

If the USCIS denies a Form I-140 application, an employer may appeal the decision

to the USCIS AAO.  8 C.F.R. §§ 103.3(a)(1)(iv), 204.5(n)(2).  The AAO has de novo authority to hear appeals of denials of immigration petitions and may address issues not raised in the initial application.  See, e.g., Soltane v. United States Department of Justice, 381 F.3d 143, 145-46 (3rd Cir. 2004).  The AAO also has jurisdiction reopen or reconsider a prior AAO decision and may do so on its own motion if it provides the parties with thirty days to submit a brief in response.  8 C.F.R. § 103.5.

## B. DISCUSSION

### 1. Ability to Pay Proffered Wage

The plaintiffs claim that the AAO's denial of the I-140 petition based on Taco Especial's failure to show an ability to pay the proffered wage was arbitrary and capricious because it focused solely on Taco Especial's net income.  Taco Especial says that, as a C-corporation, it is subject to double taxation and has an incentive to minimize its net income for tax purposes.  It asserts that the AAO should utilize gross income rather than net income when determining ability to pay.  It further asserts that the AAO should consider accounting practices whereby a corporation's real profits are shifted into depreciation or officer's salary to avoid the effect of double taxation.

The plaintiffs are correct to assert that net income is a poor indicator of ability to pay because corporations have an incentive to minimize tax liability through accounting practices that shift profits into other places.  In Construction & Design Co. v. United States Citizenship and Immigration Services, 563 F.3d 593 (7th Cir. 2009), Judge Posner found that net income may not accurately reflect a corporation's ability to pay a proffered wage.  He specifically noted that a profitable company may still show no taxable income because

corporate profit is transferred into salaries.  Id. at 596.  Instead, he stated that the government should focus on cash flow.  Id. at 595 ("If the firm has enough cash flow, either existing or anticipated, to be able to pay the salary of a new employee along with its other expenses, it can 'afford' that salary.").  However, he also emphasized that the employer bears the burden of proof in establishing ability to pay and must show where "the extra money . . . would be coming from."  Id. at 596.

In this case, the AAO acted in a rational manner by first reviewing the Federal Income Tax Returns and W2 statements submitted by Taco Especial.  It first assessed whether Taco Especial currently paid Galeana the proffered wage and noted that Taco Especial submitted no documentary evidence of the wages currently paid to Galeana.[8]  The AAO then assessed Taco Especial's net income and net current assets and found that both were insufficient to support the proffered wage of $52,000 per year.  Had the AAO based its decision solely on these three metrics, its decision may well have been arbitrary and capricious.[9]  However, the AAO went on to consider the other evidence and arguments asserted by Taco Especial.

First it addressed and rejected Taco Especial's assertion that depreciation should be added back to net income to determine ability to pay.  The AAO relied on a decision by the United States Court of Appeals for the First Circuit which held that "a depreciation

---

[8]At the rehearing before the AAO, Taco Especial asserted that it paid Galeana $17 per hour, but provided no evidence to support that assertion.

[9]The AAO has been criticized for failing to exercise its discretion to consider other relevant evidence submitted by employers.  See Posting of Dagmar Butte to AILA Leadership Blog, http://ailaleadership.blogspot.com/2009/04/ability-to-pay.html (April 30, 2009) (criticizing the USCIS for refusing to consider secondary evidence submitted by employers to demonstrate their ability to pay).

11

deduction is a systematic allocation of the cost of a tangible long-term asset" and is a "real expense." River Street Donuts LLC v. Napolitano, 558 F.3d 111, 118 (1st Cir. 2009). That court went on to state that "even though amounts deducted for depreciation do not represent current use of cash, neither does it represent amounts available to pay wages." Id.

Next the AAO considered whether the other evidence offered by Taco Especial supported a finding that it could pay Galeana a wage of $52,000 per year. It considered the total wages paid by Taco Especial during the relevant time period and noted that in 2004 Taco Especial paid a total of $69,000 in wages. It also noted that the officer's compensation varied from $26,200 to $67,750 and was less than $52,000 in all but two years. Based on this analysis, the AAO found that a job offer promising the payment of an additional $52,000 in wages was not realistic.

The AAO also rejected Taco Especial's argument that ability to pay should be based solely on gross profits. Just as net profits understate an employer's ability to pay as a result of tax incentives, gross profits overstate an employer's ability to pay because it ignores other necessary expenses. Plaintiffs' reliance on Matter of X, EAC 01-018-50413 (AAO January 31, 2003) is misplaced due to important factual differences. Although the AAO did state that net profits were not controlling, it found an ability to pay based on (1) pay stubs showing that the employer was currently paying the employee a salary in excess of the proffered wage and (2) an owner's salary of more than $200,000 per year which could be reduced "without impair[ing] the owner's own ability to earn a living." Id. In contrast, Taco Especial produced no evidence of Galeana's current wage and the owner's salary dropped as low as $26,2000 per year. In other words, Taco Especial did not

12

produce alternative evidence that was superior to net income and demonstrated an ability to pay. Moreover, it cites no authority for the proposition that gross profits, standing alone, can demonstrate the ability to pay additional salary. Without consideration of overhead, supplies, rent, payroll and the other necessary expenses which are deducted from gross profits, it is impossible to determine whether there is any "air" in Taco Especial's gross income statement. See Construction & Design Co., 563 F.3d at 596-97.

Based on a review of the record, there is nothing to suggest that the AAO's decision was arbitrary and capricious. The AAO not only considered the primary factors included in the USCIS memo, but also considered the secondary evidence supplied by Taco Especial. Taco Especial bore the burden of proof in establishing an ability to pay the proffered wage. It was given two opportunities to submit evidence demonstrating an ability to pay. In light of its failure to produce any additional documentary evidence supporting its ability to pay, the conclusory assertion that gross income is the proper measure of ability to pay is not persuasive. The AAO carefully considered the evidence before it and reached a rational conclusion based on that evidence. In light of these facts, the AAO's decision was neither arbitrary nor capricious.

## 2. Applicability of Sonegawa

Plaintiffs further assert that, even if Taco Especial cannot show an ability to pay the proffered wage, it should be excused based on the reasoning in Matter of Sonegawa. The AAO considered the evidence proffered by Taco Especial and distinguished Sonegawa. This decision was neither arbitrary nor capricious.

First, Taco Especial relies on 2009 unemployment data for metro Detroit to prove adverse economic conditions. However, the AAO found that Taco Especial had been

13

unable to pay the proffered wage since 2001 – long before the arrival of the adverse economic conditions it referenced.[10]  Second, Taco Especial asserts that it has a strong reputation in the community and that Galeana is essential to its future success.  The AAO discounted the articles submitted to support this assertion because they were focused almost exclusively on the ongoing litigation in this case, made only a brief mention of Taco Especial's reputation as a restaurant, and made no mention of Galeana.

The AAO provided Taco Especial with an opportunity to show that the reasoning used in Sonegawa should be applied in this case.  It also provided a reasoned comparison between Taco Especial's condition to that in Sonegawa and found that Sonegawa should not be applied.  Because the AAO provided a rational and reasoned comparison, the Court will not substitute its judgment for that of the AAO.

**3.**

To the extent that plaintiffs' arguments are based on Taco Especial's ability to hire Galeana as a cook and to employ him at the prevailing wage for cooks, they are inapplicable.  The Form 1-140 petition filed by Taco Especial was directed toward an approved Form ETA-750 which was directed to the position of chef and stated a wage of $25.00 per hour.  If Taco Especial wishes to employ Galeana as a cook, it must obtain approval of a new Form ETA-750 for the position of cook and then file a new I-140 petition.  It cannot change the proposed position and wage midstream in an effort to demonstrate an ability to pay a proffered wage.

---

[10]In addition, in Sonegawa, the employer demonstrated that the adverse economic conditions had ended and that it had returned to profitability.  Taco Especial can make no such assertion with respect to the economic climate in Detroit.

14

## V. CONCLUSION

For the reasons stated above, the government's motion is GRANTED and plaintiffs' motion is DENIED.  This case is DISMISSED.

SO ORDERED.


                                    S/Avern Cohn
                                    AVERN COHN
                                    UNITED STATES DISTRICT JUDGE


Dated:  March 15, 2010


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 15, 2010, by electronic and/or ordinary mail.


                                    S/Julie Owens
                                    Case Manager, (313) 234-5160